IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v | ) | CASE NO. 1:16-cr-343-MHT |
| | ) | [wo] |
| JEROME WESLEY HUGHES | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b)(1) this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law.  The defendant, Jerome Wesley Hughes ("Hughes" or "Defendant") was charged in an indictment returned on August 18, 2016.  The Indictment charged Hughes with one count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 921(a)(3)(C).  *See* Doc. 1.  Pending before this Court are the Defendant's *Motion to Suppress* (Doc. 22, filed 9/15/16) and *Amended/Supplemental Motion to Suppress* (Doc. 26, filed 9/28/16). The Government timely filed its *Response of the United States to the Defendant's Motion to Suppress* (Doc. 25, filed 9/26/16) and *Response of the United States to Defendant's Supplemental Motion to Suppress* (Doc. 27, filed 10/4/16).  The Court held an evidentiary hearing on October 5, 2016.  Based on the evidence presented to the Court, arguments of the parties, and for the reasons set forth herein, the Magistrate Judge recommends that the motions to suppress (Docs. 22, 26) be **DENIED**.

### I.  BACKGROUND AND FACTS

On August 11, 2014, officers with the Cottonwood, Alabama Police Department, ("CAPD") made the first of eight visits to the residence of Defendant Hughes on [address redacted] in Cottonwood, Alabama.  CAPD went to the residence because Hughes' then-wife

Valeria[1] complained that her minor son (when visiting Hughes) and the dogs at the residence were not being properly cared for by Hughes. At the first visit, CAPD officers observed that several dogs were present, but no one else was home when CAPD visited around 9:30 a.m.  No one was home around noon that same day when the officers returned to the home.

On October 9, 2014, Colonel Jim Smith -- the Cottonwood Director of Public Safety -- came to the property to further investigate the health and welfare complaint.  Col Smith made contact with Hughes and saw that everything was fine with the son.  At the same time, Col Smith saw several dogs on the property and noticed that the dogs lacked rabies tags and shelter.  Col Smith could only see the ones in the front yard which included one tied to a tree with no other shelter.  Col Smith told Hughes he needed to get rabies tags for each of the dogs.  After he left, Col Smith spoke to Chief of Police Mike Meadows ("Chief Meadows") and told him the dogs looked sick.

On October 10, 2014, Col Smith returned to the property to investigate another health and welfare complaint made by Valeria.  Col Smith satisfied himself that the child was in no imminent danger, but the dogs still appeared ill.  Further, a German Shepherd in the yard had problems walking.  Another dog was chained to a tree and the other dogs were freely roaming the yard.  Col Smith did not see food or water for the dogs.

Later that evening, CAPD Officer Mitch Murkerson ("Officer Murkerson") returned to the property to investigate another health and welfare complaint regarding the dogs and the minor child.  It is unclear whether anyone was home, but Officer Murkerson saw the dogs had no food or water.

On October 14, 2014, Chief of Police Mike Meadows ("Chief Meadows") went to

---

[1]  Hughes and Valeria were in the midst of divorce litigation when she made the health and welfare complaint.

Hughes' house to deliver a letter dated October 14, 2014.  In pertinent part, the letter was addressed to Hughes, signed by Smith and said:

> Dear Mr. Hughes:
>
> Officers have observed violations of the Alabama Criminal Code regarding the treatment of animals at dwelling where you are residing.  Specifically, officers observed dogs in cages too small without water or food. Officers observed emaciated dogs and none of the dogs officers observed had rabies tags displayed.
>
> You have until October 21, 2014 to correct the issues or additional steps will be taken by the Cottonwood Police Department to correct these issues.  If you have any questions, please feel free to contact Chief Edwards or me at [number redacted] or via email at [email redacted].
>
> Sincerely,
>
> Colonel Jim Smith
> Public Safety Director

*See* Government exhibit 6.

No one was home so Chief Meadows left a copy of the letter taped to the door and another copy of the letter was mailed to the home. At the door of the residence, Chief Meadows saw three French bulldogs in very small cages on the front porch.  The dogs did not have food or water.  Additionally, the floor of the cages was covered by so much feces the dogs could not sit, lay, or stand without being in contact with feces and needless to say, the cages stank of feces and urine.  Chief Meadows – who was also a canine handler –  saw the feces contained flecks of corn and the house was next to a corn field.  Finally, Chief Meadows could see the dogs were emaciated to the point he could see the ribs, hipbones, and the bones in the tails of the dogs. Chief Meadows saw a lot of feces as he walked back to his patrol car.

On October 16, 2014, Hughes called Col Smith to discuss the letter.  Hughes told Col Smith the residence belonged to his parents, but he lives in the home and the dogs belonged to him.   Hughes asked Col Smith for time to improve the situation.   Over several phone

conversations Hughes and Smith discussed the need for Hughes to vaccinate the dogs.  Hughes said that he only vaccinates a dog whenever he ships it out for sale.  Hughes also mentioned that on occasion he trained the dogs to hog fight and sells them in Louisiana.  Hughes claimed he would take the dogs to Dr. Bruce Wozow at the Cottonwood Animal Clinic.  Hughes also claimed that he ran a kennel.  Hughes took the position that overall the dogs were fine.

On November 21, 2014, Officer Murkerson came to the residence in response to a call about loose dogs in the roadway.  No one was home when Officer Murkerson came to the scene.  Officer Murkerson told Chief Meadows the dogs were in severely poor health, very skinny, and had deteriorated.

On December 30, 2014 at approximately 2:23 p.m., Chief Meadows came back to the residence in response to a complaint about the malnourishment and barking of the dogs.  No one was home when Chief Meadows got to the house.  He again saw dogs on the porch in cages.  They were standing in 1 ½ to 2 inches of feces and the bowls of water and food in the cages contained feces as well.  Chief Meadows saw approximately 100 dogs on the property and, in his opinion, 90% of the dogs needed immediate veterinary care.  Chief Meadows testified the odor of feces and urine was strong and worse yet, Chief Meadows felt the dogs looked to be starving.  Chief Meadows approached Dennis McCord who owned the adjacent property and got permission to take pictures of the dogs from his adjacent property.  The pictures taken on December 30, 2014 were presented in Government's Exhibit 2.  Chief Meadows testified the dogs he saw that day looked worse than the dog shown in exhibit 2.  The undersigned finds the dog in exhibit 2 is severely malnourished.  In addition, Chief Meadows spoke with Dr. Bruce Wozow who indicated he only saw puppies and did vaccinate some dogs for Hughes.

On January 9, 2015, Meadows obtained a search warrant signed by Houston County,

Alabama Circuit Judge Larry K. Anderson.  In pertinent part the Application and Affidavit for

Search Warrant affidavit states:

> The Cottonwood Police Department has responded to eight calls for service to [address redacted], the residence of Jerome Wesley Hughes regarding neglected animals.  These calls for service were between October and December 31, 2014. Officers have repeatedly told Jerome Wesley Hughes to take care of the animals, feed them, provide them shelter, and vaccinate them for rabies.  None of the dogs Officers have seen are wearing rabies tags in violation of Code of Alabama 1975 Section 3A-7-4.  Further, Hughes told Colonel Smith he only vaccinates the dogs he ships to Louisiana to fight hogs.  Hughes says the residence is his but the property belongs to his parents, and the dogs are his.  Hughes has told Colonel Smith that he raises and breed the dogs specifically for sale in Louisiana where they fight hogs in violation of Code of Alabama 1975 13A-12-6-c(3).  Mr. Hughes says he obtains health certificates from veterinarian Dr. Bruce Wozow of Cottonwood prior to shipping the dogs to Louisiana.  Dr. Wozow confirmed this to me on December 30, 2014.  Hughes said to Colonel Smith that he has performed and on occasion still trains dogs to fight hogs in violation of Code of Alabama 1975 13A-12-6-c(3).  I estimate that between 100 and 130 animals are present on the property.  Many appear to be in the residences as when officers are present as officer can hear dogs barking on the inside of the residence.  Colonel Smith wrote a letter to Hughes on October 14, 2014 directing him to take appropriate measures to care for the dogs.  Hughes and Colonel Smith conversed several times after this date regarding the issue with Hughes assuring Colonel Smith he was resolving the problem.  Hughes has failed to do so as observed by me on December 30, 2014 and from the photographs taken by me.  Colonel Smith contacted Chris Schindler who works for the Humane Society of the US and according to the Clark Morris AUSA of the US Attorney's Office in Montgomery; Schindler is an expert in animal related matters.  Schindler has testified, according to the AUSA Morris, as an expert witness in federal court regarding dog fighting, dog fighting training, the care and health of animals. Schindler states he is also familiar with hog dog fighting.  Colonel Smith sent the photographs to Chris Schindler who stated the dogs were severely malnourished and that body fat was needed for the dogs to avoid hypothermia in the temperatures experienced in southeast Alabama at this time of year.  Schindler stated the ribs and backbones should not be visible and this indicated severe malnourishment.  Schindler characterized the dogs as emaciated.  The condition of the dogs is a violation of Code of Alabama 1975 13A-11-241(b) because of their malnourishment.  Schindler identified these as dogos argentinos which are used commonly to fight hogs.

*See* Government Exhibit 1.  In addition to the affidavit, Chief Meadows stated he showed Judge

Anderson the pictures contained in Government's Exhibit 2.

On January 12, 2015, CPD and persons from the Humane Society executed the search warrant at Hughes' residence.  CAPD entered the residence after no one came to the door when the police knocked then announced their presence and purpose.  Emaciated dogs were still outside the residence.  As they cleared the residence the search team was greeted by the overwhelming smell and sight of urine and feces emanating from multiple sources in the house.  No residents were in the house but the search team found in plain view puppies in the laundry room that were in poor condition, marijuana on a dresser in a bedroom, narcotics paraphernalia, a homemade silencer in the kitchen, and a rifle with a homemade silencer on top of master bedroom closet.

## II. MOTION TO SUPPRESS AND AMENDED / SUPPLEMENTAL MOTION TO SUPPRESS

In the Motion to Suppress (Doc. 22) Hughes raises several arguments, all of which hinge on the fact the search warrant was not signed by a judge.  The original discovery the United States gave to Hughes did not contain a copy of the signed search warrant.  Once alerted to the issue and upon obtaining a signed copy of the search, the United States gave defense counsel the signed copy of the warrant.[2]  The only difference between the unsigned copy of the warrant in the initial discovery and the subsequent copy of was the latter copy contained the signature of Judge Anderson and the date signed.  Hence, Defendant's arguments which hinge on the warrant lacking the signature of a judge are moot.

Hughes also argues that in addition to the lack of signature, the search warrant was

---

[2]    Defendant first raised the issue of the unsigned search warrant at the August 26, 2016 initial appearance and arraignment as the initial discovery provided to defendant contained only the unsigned copy. Though the U.S. Attorney's Office may not have had the signed copy in its possession, it would appear the first time Government counsel inquired about a signed copy was after the filing of the first motion to suppress – especially in light of the September 14, 2016 email indicating no further discovery would be at issue. However, despite the lapse of time, ultimately the warrant had been signed and a copy was provided to defense.  Therefore, the argument pertaining to the lack of signature on the warrant is rendered moot.

facially deficient because "it failed to: (a) properly and/or sufficiently identify the address to be search[ed]; (b) establish probable cause necessary to issue the Search Warrant; (c) provide any evidentiary nexus whatsoever relating to the conduct of criminal activity and the areas sought to be searched; (d) provide information in support of the issuance of the warrant which was not fatally stale; (e) particularly describe the property and place to be searched; (f) identify that the property as occupied or controlled by the individual identified or mentioned in the affidavit, and (g) provide a City or State for the street or road address indicated." *See* Doc. 22 at ¶ 5. He further states "the warrant fails to particularly and adequately describe the premises to be searched" and "the seized items exceeded the scope of the warrant." *Id*. at ¶ 6-7. All these arguments can be boiled down more simply to (1) lack of probable cause, (2) failure to describe the property with particularity, (3) staleness, and (4) scope.

In the Amended/Supplemental Motion to Suppress (Doc. 26), Hughes reiterates many of the arguments in his initial Motion to Suppress (Doc. 22) and adds others. Hughes argues that the Government's failure to have a copy of signed warrant prior to the presentation of the Grand Jury means they could not rely upon the fruits of the search. *See* Doc. 26 at p. 7. Hughes also asserts that several statements contained within the affidavit supporting the search warrant were misrepresentations of fact or omission intended to mislead which renders the affidavit insufficient. *Id*. at p. 8. In short, Defendant alleges the government submitted false facts from the affidavit in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L.Ed.2d 667 (1978).

### III.    DISCUSSION AND ANALYSIS

The Fourth Amendment guards "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend.

IV.  Warrantless searches and seizures are per se unreasonable unless an exception applies.  *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576 (1967) (citations omitted).  The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights" by prohibiting the use of illegally seized evidence in criminal prosecutions. *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974).  The rule is designed to deter misconduct by law enforcement by banning evidence obtained in violation of the Fourth Amendment.  *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 442-43, 104 S. Ct. 2501, 2508, 81 L. Ed. 2d 377 (1984)).

The United States Supreme Court determined "[w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56, 98 S. Ct. at 2676.  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id*. at 171-72, 98 S. Ct. at 2684-85; *see also United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (quoting *Franks* and applying its analysis when evaluating an affidavit offered in support of a wiretap order).

The Court finds Defendant met the threshold for the hearing requirement and convened a hearing on October 5, 2016.

A.      **Probable cause**

Hughes argues the warrant affidavit fails to establish probable cause sufficient to issue a

search warrant. "Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)); *see also Zargari v. United States*, 2016 U.S. App. 17329 (11th Cir. Sep 22, 2016) (quoting *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523 (11th Cir. 1984)) (Probable cause exists "where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."). It is a common sense and practical determination synthesized from facts and inferences which may reasonably and logically drawn from facts known. *See United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (citing *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332). "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observations." *United States v. Jenkins*, 901 F.2d 1075, 1080 (quoting *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982)).

Based on this totality of the circumstances approach, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to [judges] in their probably cause determination." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citations omitted).

In the case at hand, at the most minimalist view, the search warrant affidavit reveals the officers, saw without having to enter upon the premises, abused, mistreated, ill and starving dogs

in plain view about the residence at least eight times between October 1, 2014 and December 31, 2014.  Unfortunately for Hughes, animal cruelty in Alabama is a crime.

Animal cruelty in Alabama exists when "[a] person commits the crime of cruelty to a dog or cat in the second degree if he or she, in a cruel manner, overloads, overdrives, *deprives of necessary sustenance or shelter*, unnecessarily or cruelly beats, injures, mutilates, or causes the same to be done.  Cruelty to a dog or cat in the second degree is a class A misdemeanor."  ALA. CODE § 13A-11-241(b).  Hughes' legal misfortunes are compounded under Alabama law as "any law enforcement officer . . .having reasonable belief, evidence of, or having found a dog or cat to be neglected or cruelly treated may perform either of the following: (1) Remove the dog or cat from its present location. (2)  Order the owner of the dog or cat to provide certain care to the dog or cat at the owner's expense without the removal of the dog or cat from its present location."  ALA. CODE § 13A-11-243.  Under the barest minimal reading of the affidavit facts, on January 12, 2015, Chief Meadows and the rest of the search team saw malnourished dogs at the premises and were, as a matter of Alabama law, authorized to take to safety from the premises any animals wherever found on the premises.

The facts within the four corners of the affidavit and the inferences to be drawn from the facts stretch well beyond the bare minimalist interpretation Hughes urges upon the court.  Simply put, ongoing criminal activity in plain view of law enforcement and articulated in a search warrant affidavit to a neutral and detached judge is the strongest form of proof in American jurisprudence to satisfy the Constitutional probable cause requirement.  On his own, Hughes gave CAPD the additional information to further establish probable cause.  Hughes does assert a challenge pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 in that he alleges Col Smith submitted false information to Chief Meadows regarding the telephone conversations

which reference dog fighting.  *See* Doc. 26 at p. p. 2, Exhibit 1, Affidavit.  As evidence, Hughes

submits his own affidavit stating he never discussed hog fighting or shipping any dogs to

Louisiana.  *See id.*, Exhibit 1 at p. 2.  Rather, he stated they discussed that the dogs were bred as

hunting dogs and developed specifically to hunt feral hogs.  *Id*.  Defendant Hughes also testified

the same at the hearing.  However, after the testimony the Court determined that in light of the

objections during cross examination, the Court would only consider Defendant's original direct

testimony and would not consider the testimony elicited during and after cross-examination.

With or without testimony, the Court did not find the Defendant's statements as credible when he

denied the shipment or purpose of the dogs.

Col Smith did not testify at the suppression hearing.  Thus, Defendant objected to Col

Smith's statements about the telephone conversation as hearsay.  Chief Meadows testified as to

the conversations.  The court agrees the statements are hearsay.  However, at a suppression

hearing, courts may rely on hearsay and other evidence, even though that evidence may not be

admissible at trial.  *United States v. Raddatz*, 447 U.S. 667, 679, 100 S. Ct. 2406, 65 L. Ed. 2d

424 (1980); *United States v. Matlock*, 415 U.S. 164, 172-74, 94 S. Ct. 988, 39 L. Ed. 2d 242

(1974); FED. R. EVID. 104(a), 1101(d)(1); *see also United States v. de la Fuente*, 548 F.2d 528,

532-33 (5th Cir. 1977) (noting that strict evidence rules, including the hearsay rule, do not

govern suppression hearings); *United States v. Franklin*, 284 Fed. Appx. 701, 703-04 (11th Cir.

2008) (quoting *Raddatz*) ("This evidence was properly considered because at a suppression

hearing, the court may rely on hearsay and other evidence, even though that evidence would not

be admissible at trial.") (internal quotations omitted).  Thus, the Court may consider the hearsay

statements of Col Smith regarding the telephone conversations between him and Defendant

Hughes.

Chief Meadows testified that Col Smith informed him Hughes chose to call Col Smith in response to the October 14, 2014 letter about the dogs and the welfare of the dogs.   In the ensuing conversation, Hughes told Col Smith that he owns the dogs, lives in the premises which houses the dogs, and that he would ship some of the dogs to Louisiana for hog fighting.   In short, Hughes' conversation with Smith amounts to a statement to an ongoing violation of law. Alabama law prohibits hog dog fighting and supplying, breeding, training and keeping either hogs or dogs for the purpose of such fights.   ALA. CODE. § 13A-12-6(c)(3).   The Court finds Hughes' affidavit lacks credibility especially when considering the totality of the circumstances. This includes the emaciated appearance of the dogs as shown by the pictures in Government exhibit 2, the sheer number of dogs kept on the premises, the living conditions shown in the pictures, and the dogs kept in small cages with fecal matter.   The Court finds that probable cause lies within the four corners of the affidavit to support the search warrant in this instance.

Further, even if the Court were to remove the referenced phone calls between Col Smith and Hughes, the application and affidavit still contained sufficient information to establish the requisite probable cause to issue a search warrant as there was significant independent evidence establishing the malnourishment, abuse, and neglect of the dogs. *See, e.g. United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (the Court must look to see if probable cause exists for the remainder of the affidavit after setting aside false or misleading material).   A court is allowed to uphold the validity of an affidavit "if sufficient untainted evidence was present . . . to establish probable cause," and therefore hold the warrant valid.   *United States v. Free*, 254 Fed. Appx. 765, 768 (11th Cir. 2007) (quoting *United States v. Whaley*, 779 F.2d 585, 589 n. 7 (11th Cir. 1986)).   Therefore, even if the Court agreed with Defendant's claims, the photographs and Chief Meadows observations alone would have established potential violations of Alabama law.

As such, the motions to suppress merit denial on this basis. [3]

**B.      Particularity**

Hughes next argues the warrant did not describe with sufficient particularity the place subject to search.  The search warrant issued by Judge Anderson listed the correct street address for Hughes' residence but did not contain the city, Cottonwood or the state, Alabama.  *See* Government Exhibit 1.  On its face, the Fourth Amendment requires the warrant to state with particularity the place to be searched.  While the Court finds that the particularity requirement would have easily been met by adding the city and state in the description, the lack thereof does not render the search warrant invalid.  *See United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986); *see also United States v. Harbison*, 523 Fed. Appx. 569, 573-74 (citing *Burke*) ("the physical description of the target residence, as well as law enforcement's familiarity with the property based on surveillance, puts to rest [Defendant's] contention that the officers did not have sufficiently particular information.")  *Burke* is closely on point inasmuch as the street named in the warrant did not exist in Atlanta, Georgia.  *Burke* and its progeny found the Fourth Amendment particularity requirement met when the warrant describes the premises in such a way the searching officer may "with reasonable effort ascertain and identify the place intended." *Burke*, 784 F.2d at 1092 (quoting *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985)).  Further, the Eleventh Circuit stated "[t]he warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *Id*.  The Eleventh Circuit explicitly took into account that the affiant had seen the premises and was one of the officers executing the warrant.   Here, the affidavit discusses the location Chief Meadows wanted to

---

[3]  In no way is the Court suggesting that Col Smith's statements were false or misleading, but rather showing that even without the credibility findings of the Court, the affidavit still passes constitutional

search was the same one officers had been to eight times.  Chief Meadows had personally been to the residence at least twice before seeking a warrant.  Chief Meadows is and was unquestionably known to the Circuit Judge Anderson who issued the warrant as a police officer in Cottonwood, Alabama.  Hence Chief Meadows would have had no police jurisdiction beyond Cottonwood, Alabama.  In addition, Judge Anderson is unquestionably a Circuit Judge with jurisdiction to authorize a search within his judicial circuit which includes Cottonwood, Alabama.  Finally, the pictures presented as part of the search warrant affidavit and application were pictures of Hughes' residence.  In short, Hughes presented nothing before the Court which remotely indicates that Chief Meadows intended to search any location other than Hughes' residence in Cottonwood, Alabama.  The failure of Chief Meadows and Judge Anderson to include the city and state in the warrant does not fail the particularity test of the Fourth Amendment.

**C.     Scope**

Hughes argues that the warrant did not authorize law enforcement to seize matters unrelated to dogfighting.  The Search Warrant authorized the seizure of "malnourished, neglected, and abused animals, dog fighting apparatus and dog fighting training materials, contained on printed media, optical media, magnetic media, jump drives, hard drives in any computer, photographs and text messages on any cellular telephones."  *See* Government Exhibit 1 at p. 3.  While the Court agrees that the warrant does not authorize the seizure of narcotics, silencers, drug paraphernalia, or firearms, the testimony from Chief Meadows indicates each of the items was in plain view and their criminal nature was readily apparent.

The "plain view" exception to the Fourth Amendment's warrant requirement permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized

---

muster.

object could be plainly viewed and has a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent. *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). It "allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located." *United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991). For an item's incriminating character to be "immediately apparent," the police merely need probable cause to believe that the item is contraband. *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 1542-43, 75 L. Ed. 2d 502 (1983).

For the reasons previously articulated, the Court concludes the police were lawfully present at Hughes' residence. While conducting the search of the premises for the items articulated in the search warrant, Chief Meadows testified that the evidence at issue was in plain view and the criminal nature of the items was readily apparent. The Court credits this testimony. The narcotics, firearms, silencers, and drug paraphernalia were all within plain view once the officers entered the residence to conduct the search. Hence the fruits of the search fall within the plain view exception.

### D.      Staleness

Hughes argues that the information in the warrant was stale as the affidavit speaks to activities between October 1, 2014 and December 31, 2014, but the warrant did not issue until January 9, 2015 and executed on January 12, 2015. Whether the information within an affidavit to establish probable cause is stale turns upon the facts and circumstances of the case. *United States v. Bascaro*, 742 F.2d 1335, 1345 (11th Cir. 1984) (quoting *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir.1978)); *see also United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985) ("Staleness is an issue that courts must decide by evaluating the facts of a particular

case."). There is no particular rule or time limit for when information becomes stale. *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000) (citations omitted); *see also United States v. Harris*, 20 F.3d 445, 450 ("When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations."); *United States v. Bascaro*, 742 F.2d 1335, 1345 (11th Cir. 1984) ("No mechanical test exists for determining when information becomes fatally stale.").

In considering the nature of the crime, courts have "distinguished between criminal activity which is protracted and continuous and that which is isolated." *Bervaldi*, 226 F.3d at 1265 (quoting *Bascaro*, 742 F.2d at 1345-46). For instance, "where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Id*. Items of a more durable nature or evidence of ongoing activity takes longer to become stale.

The Court finds the information in the affidavit was sufficiently fresh (i.e. not stale) on two grounds. First, the animal abuse and neglect set out in the affidavit was ongoing activity which, as a matter of fact, was continuous and in plain view on the various occasions the officers visited the residence including on January 12, 2015 the day the search warrant was executed. The totality of the circumstances indicate the October observations were likely to continue *ad infinitum* without law enforcement intervention *ergo* the information in the affidavit was fresh.

Even to the extent there was a short delay between the earlier visits and the search warrant, Hughes is partially responsible for the delay. Chief Meadows testified that Hughes asked for additional time to remedy the concerns in Col Smith's letter. While Col Smith was not obligated to grant Hughes additional time, for whatever reason he did. The Court finds that

Hughes should not now be heard to complain about the delay from the earlier October visits. Had Hughes remedied the dog abuse, law enforcement would not have seen the same (and worse) conditions on December 30, 2014. Further, Chief Meadows' visit on December 30, 2014 renewed and heightened the concerns and clearly established the neglectful and abusive conduct was still occurring. Therefore, the evidence presented before Judge Anderson established protracted and continuous conduct of the animal abuse – which also established the likelihood that probable cause for the violation of hog-dog fighting.

**E.     Reasonableness / Leon Good Faith**

Lastly and in the alternative, even if the probable cause finding by Judge Anderson was in error, the *Leon* good faith exception to the Exclusionary Rule applies in this case. *See United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984). The *Leon* good faith exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Robinson*, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citing *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002)); *see also United States v. Mathis*, 767 F.3d 1264, 1276-77 (11th Cir. 2014) (reiterating principles of *Leon*). There are only four situations where the good faith exception does not apply:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient- i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*Martin*, 397 F.3d at 1313 (citing *Leon*, 468 U.S. at 923, 104 S. Ct. 3405).  Defendant does not assert any argument under the second situation and asserted Judge Anderson wholly abandoned his judicial role.  Therefore, the Court looks to the other three situations.

Hughes does assert Col Smith provided false information to Chief Meadows regarding the telephone conversation.  Ultimately Chief Meadows submitted the information as part of his affidavit in support of the application for a search warrant.  However, as discussed previously, the Court has rejected Defendant's assertion.  Therefore, the Court finds the first situation does not apply in the case at hand.

Next, the Court concludes the warrant was not facially defective to the extent a reasonable officer could not rely upon the warrant.  Chief Meadows told Judge Anderson what he and other law enforcement officers knew and observed with respect to Hughes and the activities at the Hughes' residence.  The Court finds this conclusion particularly strong as the issuance of a search warrant is the responsibility of the Judge rather than the police. In sum, Chief Meadows and the other officers did what the courts want law enforcement to do when the privacy interests of the home must give way to a search.  Specifically, Chief Meadows told a neutral and detached judge the necessary information known by law enforcement and the judge made an independent decision to issue a search warrant.  The Court sees nothing to be gained by the operation of the exclusionary rule in this respect.  There is no societal interest to be furthered or police misconduct to be deterred by the operation of the exclusionary rule in this matter.

Next, the Alabama hog-dog fighting statute coupled with the Alabama animal cruelty law allow police to remove animals without a warrant.  The deplorable conditions surrounding the dogs were dire enough for the police to act promptly.  But, law enforcement gave Hughes ample time remedy the situation and to feed and care better for the dogs.  Hughes chose not to care for

the dogs so when the officers came to execute the search warrant the dogs were in the same or worse circumstances than when the situation first came to the attention of law enforcement in October, 2014.  Without the actions of law enforcement attempting to execute the warrant, valid or not, innocent animals were most likely at worst to die and, at best, suffer a good deal longer.

The purpose of the exclusionary rule is to act as "a deterrent to willful conduct that violates individual rights."  *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). Here, the law enforcement officers did exactly what the law requires.  It is undisputed that an application and affidavit for a search warrant was submitted to an Alabama circuit judge who then made a probable cause determination.  Chief Meadows sought judicial permission and gave a neutral and detached judicial officer all of the information the judicial officer determined he needed to authorize search warrant.  Nothing on its face would demonstrate to a reasonable law enforcement officer that the affidavit was in any way deficient in this or any other regard. Moreover, with the exception of Hughes' self-serving affidavit, the Court finds there is no indication that Chief Meadows was dishonest or reckless in preparing his affidavit. Consequently, the reliance on the search warrant was appropriate and accordingly, the good faith exception precludes suppression of the evidence.

## IV.   CONCLUSION

Accordingly, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Suppress* (Doc. 22, filed 9/15/16) and *Amended/Supplemental Motion to Suppress* (Doc. 26, filed 9/28/16) be **DENIED**.

It is further **ORDERED** that the parties file any objections to this Recommendation on or before **November 10, 2016.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or

general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 27th day of October, 2016.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE